**Wallace L. HALL, Jr., in His Official Capacity as A Regent for the University of Texas System, Petitioner,**

v.

**William H. MCRAVEN, in His Official Capacity as Chancellor for the University of Texas System, Respondent**

NO. 16-0773

Supreme Court of Texas.

Argued January 11, 2017

OPINION DELIVERED:
January 27, 2017

Joseph R. Knight, for Wallace L. Hall.

Stephanie Duff-O'Bryan, Kayla Carrick, Amy Warr, Wallace B. Jefferson, Patton G. Lochridge, Richard D. Milvenan, for William H. McRaven

Justice Devine delivered the opinion of the Court.

Wallace Hall, a regent for The University of Texas System, sued the System's Chancellor, William McRaven, for McRaven's refusal to grant Hall complete access to records containing student-admissions information. At the heart of the case are issues central to governance in higher education. Does a university regent have an inherent right to access information? If so, how unfettered is that right? Can an institution invoke federal privacy law, namely the Family Educational Rights and Privacy Act (FERPA), to redact information and limit a regent's quest for complete access? These are important questions, but before a court can reach them, a plaintiff must overcome the state's sovereign immunity. Absent a statutory waiver of immunity by the Legislature, Hall can proceed only if McRaven's actions in redacting the records were *ultra vires*—without state authority. The courts below held that McRaven's conduct was not *ultra vires* and that sovereign immunity required dismissal. We agree and affirm.

## I

*Ultra vires* claims depend on the scope of a state official's authority. The natural starting point in this case, therefore, is the governing structure of the UT System. The authority and duties of the leaders of UT come from various sources, each with an increasing level of specificity. First, the Texas Constitution instructs the Legislature to "organize and provide for the maintenance, support and direction of a University of the first class, to be located by a vote of the people of this State, and styled, 'The University of Texas.'" TEX. CONST. art. VII, § 10. Acting on that directive, the Legislature established the UT System and vested governing power in a nine-member Board of Regents. TEX. EDUC.

CODE § 65.11. Each regent is appointed by the Governor with the advice and consent of the Senate. *Id.* The Legislature gave expansive authority to the Board to "govern, operate, support, and maintain" the System. *Id.* § 65.31(a). The Board must also "provide the policy direction" for each respective institution within the UT System. *Id.* § 51.352(b) (assigning responsibilities to all governing boards of institutions of higher education in Texas). The Board also bears more specific statutory responsibilities, such as to "set campus admission standards." *Id.* § 51.352(d)(4).

■ The Board is not expected to run the entire UT System by itself. Instead, the Legislature authorized the Board to promulgate rules and to use those rules to "delegate a power or duty of the board to a committee, officer, employee, or other agent of the board." *Id.* § 65.31(c), (g). These rules, the Regents' Rules, have the same force as an "enactment of legislature." *Univ. of Hous. v. Barth*, 403 S.W.3d 851, 855 (Tex. 2013).

The Legislature also directs the Board to appoint the Chancellor "or other chief executive officer of the system." TEX. EDUC. CODE. § 51.352(d)(2). But the Education Code says little else about the Chancellor's duties, save the following:

> Subject to the power and authority of the board, the chief executive officer is responsible for the general management of the university system within the policies of the board and for making recommendations to the board concerning the organization of the university system and the appointment of the chief administrative officer for each component institution within the system.

*Id.* § 65.16(c). As a result, the specific responsibilities of Chancellor McRaven—which are of utmost importance to this lawsuit—come from the rules and resolutions of the Board, which we consider in

the context of this dispute between the System's Chancellor and one of its regents.

## II

The underlying dispute began in 2013, when Regent Hall raised concerns about potential improprieties in the admissions process of UT Austin, one of the 15 institutions that comprise the UT System. In response, then-Chancellor Francisco Cigarroa ordered an internal inquiry into the admissions practices. That inquiry revealed a common practice of legislators, alumni, regents, and other influential individuals recommending students for admission to UT Austin outside of the established procedures for submitting such recommendations. These findings spurred Chancellor Cigarroa to commission another investigation into the UT Austin admissions process: an independent, external investigation performed by Kroll Associates, Inc.

In the midst of Kroll's investigation, McRaven took over as Chancellor of the UT System. Kroll then released its findings in a 101-page report. The "Kroll Report" outlined a practice of UT Austin's President—based on recommendations from influential persons—to exercise significant oversight and discretion in the admissions process. Such oversight sometimes resulted in the admission of underqualified students over the objection of admissions officials. While Kroll determined this practice might not be a violation of any existing rules or laws, it did "not appear in UT-Austin's public representations." Chancellor McRaven received the Kroll Report, reviewed its findings, and concluded that disciplinary action was not warranted against the President or any other admissions official.

The findings of the Kroll Report became available to the public. Likewise, the names of those influential persons who

wrote letters of recommendation became available to the public in response to requests made under the Texas Public Information Act. But neither the public nor the regents were given access to the hundreds of thousands of pages of documents containing student records that Kroll reviewed in coming to its conclusions. Hall wanted to review those underlying records to, among other things, assess the involvement of specific school officials, identify pressures put on admissions officials, and determine whether Kroll omitted any significant information from the report.

Hall requested access to this information from the Chancellor's office in March 2015, but McRaven resisted the request. Regents' Rule 10801 governs the procedure for dealing with information requests of this type and provides a process for when the Chancellor's "concerns about a Regent's request" remain unresolved. The Univ. of Tex. Sys., Rules and Regulations of the Bd. of Regents ("Regents' Rules"), Rule 10801 § 5.4.5. As of April 2015, Section 5.4.5 provided that,

> the matter will be presented to the Board as quickly as possible, but in no event later than 21 days from the date of the receipt of the request. For the purpose of a Board vote on this issue, the vote of any two or more Regents in support of the request is sufficient to direct that the request will be filled without delay.

*Id.* (Apr. 8, 2015). On April 8, the Board held a meeting under Section 5.4.5. Three regents (including Hall) voted to grant the request. But, importantly, the two regents joining Hall conditioned their votes on the Chancellor's office engaging in a review to determine which information was protected by FERPA.

FERPA is a federal privacy law that withholds federal funding from institutions that have a "policy or practice of permit-

ting the release of education records ... or personally identifiable information." 20 U.S.C. § 1232g(b)(1). FERPA, however, permits the release of these records to "other school officials ... who have been determined by such agency or institution to have legitimate educational interests." *Id.* § 1232g(b)(1)(A).

At the time of the April vote, no Regents' Rule governed how the Chancellor's office would conduct a FERPA review. However, in the following month, the Board adopted Section 5.4.6 to Regents' Rule 10801, which specifically outlines the Chancellor's role in this review. Regents' Rule 10801 § 5.4.6 (effective May 14, 2015). Section 5.4.6 delegates the following duty:

> [T]he Chancellor, in consultation with the U.T. System General Counsel, shall determine whether State or federal law restricts compliance with the request. Accordingly, the Chancellor, in consultation with the U. T. System General Counsel, shall determine whether a Regent may review information that is protected by [FERPA] ....

*Id.* When the board members adopted Section 5.4.6, they also amended Section 5.4.5 to require a vote of a majority of the Board—not just two regents—to approve an unresolved request for information. *Id.* § 5.4.5 (effective May 14, 2015).

In the meantime, Hall again requested complete access, providing a list of reasons that he argued gave him a "legitimate educational interest" under FERPA. McRaven refused to provide access to the complete records, while simultaneously proposing a two-step process by which Hall could seek access to specific redacted information. First, the Chancellor's office would redact all information protected by FERPA and other privacy laws. These redactions applied to information such as students' names, grade point averages, so-

cial security numbers, and other identifying information. *See* 20 U.S.C. § 1232g(a)(4)(A) (identifying records which "contain information directly related to a student" as covered by FERPA). Then, if Hall identified specific private information and articulated a specific need, the System's General Counsel could review that request.

Unsatisfied with this proposal, Hall sued McRaven—in his official capacity as Chancellor of the UT System—for continuing to withhold access to the unredacted records. Hall sought a declaratory judgment that McRaven acted *ultra vires* in refusing to provide the unredacted information. Hall also sought a writ of mandamus or injunction to compel McRaven to provide the records.

The Board held a special meeting a few weeks later to "effect a clear and open statement of the position of the Board of Regents related to" Hall's pending litigation. A majority of the Board voted on July 8, 2015, to endorse McRaven's two-step offer of access. The Board characterized that process as follows:

1) access to review all confidential and nonpublic documents gathered by Kroll, with redactions only for those documents and information protected by the Family Educational Rights and Privacy Act (FERPA), the Health Insurance Portability and Accountability Act (HIPAA), or other privacy laws, as determined applicable by the Vice Chancellor and General Counsel in consultation with the System Administration Privacy Officer and Systemwide Privacy Coordinator, and
2) the opportunity for Regent Hall to identify and to discuss further, with the Chairman and the Chancellor, specific, redacted private information protected by FERPA, HIPAA, or other privacy laws in those documents which he believes are necessary to review in order to satisfy an articulated, specific need related to his official responsibilities and duties as a Regent.

The Board also voted to "delegate to the Chairman, in consultation with the Vice Chairmen and General Counsel," the authority to make the decision under step two: whether or not Hall articulated a specific need.

Following the Board's July vote, McRaven filed a plea to the jurisdiction, claiming that sovereign immunity barred Hall's suit and that the *ultra vires* exception did not apply. Hall responded to McRaven's plea to the jurisdiction and moved for summary judgment, claiming a right to the unredacted records as a matter of law. Hall asserted that as a regent he possessed an inherent right under Texas law—as outlined by an opinion from the Texas Attorney General—to access records pertinent to his duties. *See* Tex. Att'y Gen. Op. No. KP-0021, 4 (2015) (addressing whether Hall has a right to the unredacted records). He submitted that one such duty was to set admissions standards, which invoked his inherent right to access student information unless state or federal law required otherwise. *Id.* FERPA, he argued, could not be the basis for withholding these records because his status as a regent imbued him with a "legitimate educational interest" in the information. Hall concluded that McRaven's actions in denying him complete access were *ultra vires* because McRaven had no authority to misapply FERPA and wrongfully withhold the records. The trial court held a hearing on the two motions, granting McRaven's plea to the jurisdiction and dismissing the case with prejudice. Hall appealed, and the court of appeals affirmed. 504 S.W.3d 414, 2016 WL 4979576, at *1 (Tex. App.–Austin 2016). We granted

Hall's petition for review and expedited briefing and oral argument.

## III

▮▮▮ Sovereign immunity requires the state's consent before it can be sued. *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 224 (Tex. 2004). Sovereign immunity developed as a common-law doctrine in recognition of the courts' limited authority over the sovereign creating them. *Brown & Gay Eng'g, Inc. v. Olivares*, 461 S.W.3d 117, 121 (Tex. 2015). Its justification continues today as a means to protect the public treasury. *Id.* Consequently, the doctrine operates to "shield the public from the costs and consequences of improvident actions of their governments." *Tooke v. City of Mexia*, 197 S.W.3d 325, 332 (Tex. 2006).

▮▮▮ The sovereign may, however, waive or limit its immunity. But the Legislature has not waived immunity for suits like Hall's. Nevertheless, in certain narrow instances, a suit against a state official can proceed even in the absence of a waiver of immunity if the official's actions are *ultra vires. City of El Paso, v. Heinrich*, 284 S.W.3d 366, 372 (Tex. 2009). An *ultra vires* action requires a plaintiff to "allege, and ultimately prove, that the officer acted without legal authority or failed to perform a purely ministerial act." *Id.*

▮▮▮ We recently clarified what it means for an official to act "without legal authority." *See Houston Belt & Terminal Ry. Co. v. City of Houston*, 487 S.W.3d 154, 158 (Tex. 2016). We said that "a government officer with some discretion to interpret and apply a law may nonetheless act 'without legal authority,' and thus *ultra vires*, if he exceeds the bounds of his granted authority or if his acts conflict with the law itself." *Id.* "Ministerial acts," on the other hand, are those "where the law prescribes and defines the duties to be performed with such precision and certainty as to leave nothing to the exercise of discretion or judgment." *Sw. Bell Tel., L.P. v. Emmett*, 459 S.W.3d 578, 587 (Tex. 2015) (quoting *City of Lancaster v. Chambers*, 883 S.W.2d 650, 654 (Tex. 1994)).

The basic justification for this *ultra vires* exception to sovereign immunity is that *ultra vires* acts—or those acts without authority—should not be considered acts of the state at all. *Cobb v. Harrington*, 144 Tex. 360, 190 S.W.2d 709, 712 (1945). Consequently, "*ultra vires* suits do not attempt to exert control over the state—they attempt to reassert the control of the state" over one of its agents. *Heinrich*, 284 S.W.3d at 372.

## IV

▮▮▮ The court of appeals held that McRaven acted within his legal authority when he continued to withhold unredacted records from Hall. 504 S.W.3d at 425–28, 2016 WL 4979576, at *9. According to the court, this was "because it was the Board, through its [July] majority vote, who ultimately refused to allow Hall full access to the Kroll file without redaction." *Id.* More specifically, the court viewed the July vote as showing that the Board "implicitly determined that Hall does not have a legitimate educational interest in the information and that it may be protected by other privacy laws." *Id.* Essentially, because the Board endorsed McRaven's process, and because McRaven serves at the behest of the Board, McRaven was within his authority in refusing full access. *See id.* Both Hall and McRaven characterize this holding as indicating that McRaven was not the "proper party" to this *ultra vires* suit.

*Heinrich* is our only case to speak about a proper party in the context of an *ultra vires* suit. 284 S.W.3d at 372–73. There we clarified that the governmental entities

themselves were not proper parties to an *ultra vires* suit. *Id.* Instead, a plaintiff must sue the relevant officers in their official capacities. *Id.* Of course, that is not an issue in this lawsuit. Hall sued McRaven, a state officer, in McRaven's official capacity, and McRaven is unquestionably a proper party to the *ultra vires* suit in *Heinrich*'s sense of the term. But here, the parties argue about proper parties in an entirely different sense: as a means of horizontal selection—pinpointing which official has the duty to act.

 An *ultra vires* claim based on actions taken "without legal authority" has two fundamental components: (1) authority giving the official some (but not absolute) discretion to act and (2) conduct outside of that authority. *Hous. Belt*, 487 S.W.3d at 158. The proper-party plea by a state official is another way of saying a higher power has deprived the official of all of his or her discretion. In other words, the higher authority has created a *ministerial* (nondiscretionary) duty for the subordinate official to engage in conduct the plaintiff claims is wrongful. Thus, the proper-party question is nothing foreign; it goes to the first component of *Houston Belt*'s clarification of a "without legal authority" claim. *Id.* The court of appeals' discussion adheres to this framework. *See* 504 S.W.3d at 425–28, 2016 WL 4979576, at *9.

In that context, we must decide whether the Board's July vote deprived McRaven of all discretion. Hall argues it did not. We agree, at least with respect to a narrow course of action: the Chancellor's interpretation of federal privacy law. On July 8, the Board endorsed McRaven's two-step offer of access. The first of those steps, as characterized by the Board, left in place the understanding that questions of law relating to FERPA would remain "as determined applicable" by the Chancellor's

office. This was made all the more clear during questioning of the UT System's General Counsel, Dan Sharphorn, at the trial court's jurisdictional hearing. When asked about the effect of the July endorsement, Sharphorn agreed that "the vote in July directed the chancellor to provide all of the information, redacting only what is required to be redacted by privacy law." Sharphorn also agreed that "the vote in July still left open the question [of] what data in the Kroll file, if any, it was legal to provide to Regent Hall." Sharphorn elaborated that his mission was to make sure it was legal to provide the information and that "the subsequent vote by the Board of Regents in July didn't change that mission." If the July vote conclusively deprived McRaven and his top legal advisor of any discretion to decide legal questions under FERPA, it was not Sharphorn's understanding. Finally, that the Board continued to delegate the duty of interpreting FERPA to the Chancellor's office is no surprise. After all, just two months prior, the Board amended the Regents' Rules to assign that precise duty to the Chancellor. *See* Regents' Rule 10801 § 5.4.6 (delegating to the Chancellor—in consultation with the General Counsel—the duty to "determine whether a regent may review information that is protected" by FERPA).

The court of appeals' opinion implies that McRaven and his subordinates had no discretion to decide the threshold question of law under FERPA because those questions were authoritatively settled by the Board's July vote. 504 S.W.3d at 425–28, 2016 WL 4979576, at *9 (finding that the Board's July vote "implicitly determined that Hall does not have a legitimate educational interest in the information and that it may be protected by other privacy laws"). The language of the July resolution, Sharphorn's testimony, and the explicit delegation of authority via the Re-

gents' Rules belie any such implication. McRaven retained discretion to interpret FERPA, and, with respect to the legitimate exercise of that discretion, McRaven would remain subject to *ultra vires* principles.

But to the extent Hall's lawsuit implicates a broader indictment, we agree with the court of appeals that the Board would be to blame, not McRaven. Hall claims an unfettered right to access—one free from limits other than disclosures that would violate other laws. Hall argues further that FERPA is categorically inapplicable to a regent's request for information he finds necessary to fulfill his job. If Hall is right about those legal questions, the Board has restricted that right in two ways. First, the Board amended Section 5.4.5 of Rule 10801 to require a majority of regents to approve a request for information. Second, the Board created a governance scheme in which the Chancellor's discretionary determination of federal law can lead to redactions of information. *See* Regents' Rule 10801 § 5.4.6.

These are concrete limits on Hall's claimed right to complete access. But they are limits imposed by the Board—not McRaven. Hall did not explicitly challenge these rules in his *ultra vires* suit. Nor could he by suing McRaven alone. By its very definition, an *ultra vires* suit against McRaven can only seek to compel him to *follow* his governing authority, not to change that governing authority. *Heinrich,* 284 S.W.3d at 372 (explaining that *ultra vires* "suits do not seek to alter government policy but rather to enforce existing policy"). Because Hall chose to sue McRaven, his complaint must necessarily be a limited one: McRaven made an allegedly incorrect determination under FERPA and that erroneous interpretation resulted in an unlawful redaction of records.

But before considering the merit of the *ultra vires* claim, we must consider Hall's alternative argument regarding McRaven's proper-party status. Hall claims that McRaven, as the highest-ranking officer of the UT System, is the proper "nominal defendant" in a suit that is functionally directed at UT as an entity. If this were true, McRaven would be the proper defendant with respect to complaints about the above decisions: ones that are attributable to the Board and no one else. For that matter, McRaven would be the proper defendant for any *ultra vires* complaint against any UT officer. But Hall's argument misunderstands the *ultra vires* exception.

Hall correctly argues that a suit against a state official in his official capacity "is merely 'another way of pleading an action against the entity of which [the official] is an agent.'" *Tex. A&M Univ. Sys. v. Koseoglu,* 233 S.W.3d 835, 844 (Tex. 2007) (quoting *Kentucky v. Graham,* 473 U.S. 159, 166, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985)). Yet equally clear is the notion that *"ultra vires* suits do not attempt to exert control over the state— they attempt to reassert the control of the state." *Heinrich,* 284 S.W.3d at 372. To reassert such control, an *ultra vires* suit must lie against the "allegedly responsible government actor in his official capacity," not a nominal, apex representative who has nothing to do with the allegedly *ultra vires* actions. *Patel v. Tex. Dep't of Licensing & Regulation,* 469 S.W.3d 69, 76 (Tex. 2015). Therefore, an *ultra vires* claim against McRaven must be confined to conduct pursuant to his authority: the duty to interpret and apply FERPA to information requests.

## V

And so we reach the dispositive issue: whether McRaven's alleged misin-

terpretation of FERPA constitutes an *ultra vires* act. We hold that it does not.[1] More globally, this case implicates every mistake of law by a state official and whether such errors are always *ultra vires*, particularly in light of our opinion in *Houston Belt.*

*Heinrich* clarified two general means of proving an *ultra vires* claim: (1) an action "without legal authority" or (2) failure to "perform a purely ministerial act." 284 S.W.3d at 372. In *Houston Belt*, we addressed what it means to act without legal authority in the context of a particular type of *ultra vires* claim: an allegation that an official has exceeded his or her granted authority to "interpret and apply a law." 487 S.W.3d at 158, 160–63. We concluded that sovereign immunity "bars suits complaining of an exercise of *absolute* discretion but not suits complaining of . . . an officer's exercise of judgment or *limited* discretion without reference to or in conflict with the constraints of the law authorizing the official to act." *Id.* at 163 (emphasis in original). Although not directly applicable, we quoted for comparative purposes the rule that a public officer generally lacks discretion or authority to misinterpret the law. *Id.* (quoting *In re Smith*, 333 S.W.3d 582, 585 (Tex. 2011) (orig. proceeding)).[2]

Hall assumes that our mention of misinterpretations of the law in *Houston Belt* necessarily means that any legal mistake is an *ultra vires* act. Not so. It is the mistake's impact on the official's authority that carries dispositive weight for *ultra vires* purposes. In *Houston Belt*, we

examined an *ultra vires* claim against Houston's Director of Public Works and Engineering. *Id.* at 158. The plaintiff complained that the Director acted *ultra vires* in imposing a drainage fee based on an unlawful determination of the permeability of the plaintiff's property. *Id.* at 159. The ordinance authorizing the Director to act commanded him to make that permeability determination "on the basis of digital-map data . . . or other similar reliable data as shall be determined by the director." *Id.* Instead of using digital map data, or something similar, the Director looked at aerial photographs to make his permeability determination. *Id.* We found that while the ordinance gave some discretion to the Director, the discretion was not absolute. *Id.* at 168. Therefore, the Director's misinterpretation of his own limits in making a permeability determination was a valid basis for an *ultra vires* claim. *Id.* at 169.

Like *Houston Belt*, this case involves an *ultra vires* claim based on a state official allegedly exceeding his granted authority to "interpret and apply a law." *Id.* at 158. But the *ultra vires* claim in *Houston Belt* differs from Hall's claim in two key respects. First, the Director's misinterpretation was of the requirements of his *enabling law. Id.* at 158, 165 (explaining that the limits of the Director's "authority [were] found in the authority-granting law itself—the ordinance"). Consequently, when the Director misinterpreted the limits of the ordinance, he misinterpreted the bounds of his own authority—exceeding the scope of what the City permitted him

---

1. We do not decide what constitutes a "legitimate educational interest" under FERPA or any other questions of federal privacy law. For purposes of addressing whether Hall's *ultra vires* claim is proper, we assume for the sake of argument that McRaven and his legal advisors incorrectly interpreted FERPA.

2. *Smith* did not concern an *ultra vires* exception to sovereign immunity because a statute in that case expressly waived the state's immunity, and the issue was whether the officer had erroneously calculated the compensation due under the statute. 333 S.W.3d at 585–87.

to do. *See id. Houston Belt* synthesized several cases in reaching the conclusion that limited discretion can give rise to an *ultra vires* claim. *Id.* at 162–63. Every case [3] involved an interpretation of the official's enabling authority. *See id.* Here, McRaven's interpretation is not of his organic authority but rather federal privacy law—a law *collateral* to McRaven's authority. It is Section 5.4.6 of Regents' Rule 10801, not FERPA, that supplies the parameters of McRaven's authority:

> [T]he Chancellor, in consultation with the U.T. System General Counsel, shall determine whether State or federal law restricts compliance with the request. Accordingly, the Chancellor, in consultation with the U. T. System General Counsel, shall determine whether a Regent may review information that is protected by [FERPA] ....

Regents' Rule 10801 § 5.4.6. In order to act without legal authority in carrying out a duty to interpret and apply the law, McRaven must have exercised discretion "without reference to or in conflict with the constraints of the law authorizing [him] to act": Section 5.4.6. *Hous. Belt*, 487 S.W.3d at 163. Without that showing, Hall would simply have no basis for "reassert[ing] control of the state." *Heinrich*, 284 S.W.3d at 372.

Admittedly, that begs the question of whether McRaven's allegedly mistaken interpretation of collateral law was nevertheless in violation of his enabling authority. This brings us to another key difference between *Houston Belt* and the present case. In *Houston Belt*, the Director's determination was subject to explicit constraints, i.e., what to consider in reaching a permeability determination. 487 S.W.3d at 159. Neglecting one of those constraints was what made the Director's determination—whether right or wrong—*ultra vires*. *See id.* at 161. In other words, the Director's discretion was limited in *how* he reached a conclusion. *See id.* Here, McRaven is indeed tasked with making a determination. But that is it. McRaven's only duty is that he "shall determine whether a Regent may review information that is protected by [FERPA]." Regents' Rule 10801 § 5.4.6. His discretion in making that determination is otherwise unconstrained.

When the ultimate and unrestrained objective of an official's duty is to interpret collateral law, a misinterpretation is not overstepping such authority; it is a compliant action even if ultimately erroneous. Our intermediate courts of appeals have repeatedly stated that it is not an *ultra vires* act for an official or agency to make an erroneous decision while staying within its authority.[4] Indeed, an *ultra vires* doctrine that requires nothing more than an identifiable mistake would not be a

---

**3.** *See Heinrich*, 284 S.W.3d at 369 (finding valid an *ultra vires* suit against a pension fund based on the fund retroactively lowering the plaintiff's pension in violation of its enabling statute); *Klumb v. Hous. Mun. Emp's. Pension Sys.*, 458 S.W.3d 1, 9 (Tex. 2015) (finding invalid an *ultra vires* claim against a pension fund for allegedly acting "without legal authority by expanding [the enabling statute's] definition of 'employee' without the City's approval and in conflict with the plain language of the statute"); *Emmett*, 459 S.W.3d at 589 (finding valid an *ultra vires* claim against the Harris County Commissioner's Court for failing to authorize payments that the enabling statute—the Water Code—required the Com-

missioners to authorize); *Tex. Parks & Wildlife Dep't v. Sawyer Tr.*, 354 S.W.3d 384, 386, 393 (Tex. 2011) (implying an *ultra vires* claim might succeed against the Parks and Wildlife Department for a mistaken application of the Parks and Wildlife Code).

**4.** *See, e.g., Edinburg Consol. Indep. Sch. Dist. v. Smith*, No. 13–16–00253–CV, 2016 WL 3068119, at *13 (Tex. App.–Corpus Christi May 26, 2016, no pet.) (mem. op.) (explaining that it is "clear that not all alleged errors in interpretation of law or policy constitute ultra vires acts"); *Creedmoor–Maha Water Supply Corp. v. Tex. Comm'n on Envtl. Quality*, 307 S.W.3d 505, 517–18 (Tex. App.–Austin 2010,

narrow exception to immunity: it would swallow immunity. After all, do not all successful lawsuits require a legal wrong? As important as a mistake may be, sovereign immunity comes with a price; it often allows the "improvident actions" of the government to go unredressed. *See Tooke*, 197 S.W.3d at 332 (explaining that sovereign immunity functions "to shield the public from the costs and consequences of improvident actions of their governments"). Only when these improvident actions are *unauthorized* does an official shed the cloak of the sovereign and act *ultra vires*.

Based on the unrestricted nature of McRaven's authority under Section 5.4.6, we find his discretion to interpret collateral federal privacy law to be "absolute" under our framework from *Houston Belt*. 487 S.W.3d at 163 (explaining that sovereign immunity bars suits targeting an exercise of absolute discretion). As such, McRaven—whether right or wrong—was not without legal authority in making that determination. Nor was he without authority in redacting information once he made the legal conclusion. The Board instructed him to redact information he determined protected under FERPA, and he did just that.

Finally, did McRaven violate a purely ministerial duty? *See Heinrich*, 284 S.W.3d at 372 (explaining that the other ground for an *ultra vires* suit is a failure to perform a "purely ministerial act"). Perhaps it

goes without saying, but if an official's duty is discretionary, it is not also nondiscretionary. The authority conferred by the Board onto McRaven is quite the opposite of "where the law prescribes and defines the duties to be performed with such precision and certainty as to leave nothing to the exercise of discretion or judgment." *Emmett*, 459 S.W.3d at 587 (defining a ministerial duty). Having failed to meet either of the bases for establishing an *ultra vires* action under *Heinrich*, we conclude that Hall's case was properly dismissed.

\* \* \*

We are not unsympathetic to Hall's plight, however. He seeks information to educate himself and his fellow regents about issues of undeniable importance to the institution. Facts are the greatest ally of those, like Hall, who seek to change the minds of others. Yet the Board has instituted a governance structure that leaves Hall at the mercy of the Chancellor's discretionary legal determination, at least in the first instance. Perhaps that scheme is unwise. Perhaps it elevates the status quo above transparency. Perhaps it increases the likelihood that voices in the minority will be stifled. And perhaps it presents none of those dangers. But those questions are beyond our reach; the Legislature is the ultimate arbiter of policy at The University of Texas. In this suit we are simply tasked with assessing whether Chancellor McRaven exceeded his authority. On this

---

no pet.) ("These are allegations that [the agency] reached an incorrect or wrong result when exercising its delegated authority, not facts that would demonstrate [the agency] exceeded that authority."); *MHCB (USA) Leasing & Fin. Corp. v. Galveston Cent. Appraisal Dist. Review Bd.*, 249 S.W.3d 68, 81 (Tex. App.–Houston [1st Dist.]·2007, pet. denied) ("Additionally, just because an agency determination is wrongly decided does not render that decision outside the agency's authority [because] an incorrect agency determination

rendered *pursuant* to the agency's authority is not a determination made *outside* that authority.") (emphasis in original); *Williams v. Hous. Firemen's Relief& Ret. Fund*, 121 S.W.3d 415, 430 (Tex. App.–Houston [1st Dist.] 2003, no pet.) ("Williams does not challenge the fact that the Fund has ... this statutory authority. ... [T]he crux of Williams's argument is that the trustees interpreted the statute in a way they should not have. This is a complaint of 'getting it wrong,' not of acting outside statutory authority.").

record, we conclude that he did not. The judgment of the court of appeals is accordingly affirmed.

JUSTICE WILLETT filed a concurring opinion.

JUSTICE GUZMAN filed a concurring opinion.

JUSTICE LEHRMANN filed a concurring opinion.

JUSTICE WILLETT, concurring.

In 1935 a stone carver named Wood Hall risked his life for nearly three weeks to chisel twelve words across the iconic centerpiece of the University of Texas campus: "Ye shall know the truth and the truth shall make you free." [1]

The UT Tower, the definitive landmark of a world-renowned "University of the first class,"[2] soars 307 feet. The 360-degree view from high above is spectacular, stretching far and wide.[3]

Once the site of unspeakable sorrow, the Tower is the signature backdrop for exultant commencements and is regularly illuminated in orange to mark athletic championships and academic honors—plus Texas Independence Day, of course.

When the words from John's Gospel were inscribed above the south entrance to the Tower's Victorian-Gothic Main Building, the building fittingly served as the University's central library, the place where truth was sought and curiosity quenched.

The architecture is commanding, and from the observation deck roughly two-dozen stories above Jesus's words, one can locate other Austin landmarks that help tell the story of perpetually curious UT System Regent Wallace Hall:

- Texas Capitol—where Governor Rick Perry appointed, and the Senate confirmed, Hall to the System's governing board, and where Regent Hall's dogged inquiries regarding various matters at flagship UT-Austin, most notably improper favoritism in admissions, sparked legislative and

---

1. *John* 8:32 (King James).

2. Tex. Const., art. VII, § 10.

3. Proud Texans will put aside the fact that UT's majestic Tower was partly inspired by the city hall building in ... Camden, New Jersey. As UT's esteemed architect, Paul Cret, sketched Tower designs, he gazed from his Philadelphia office across the Delaware River into Camden, whose new city hall dominated the skyline. *How "Texan" is the UT Tower?* https://jimnicar.com/2013/03/23/how-texan-is-the-ut-tower/ (last visited Jan. 24, 2017).

criminal investigations of his penchant for requesting records and posing uncomfortable questions;

- UT System Offices—where the Board of Regents heard the results of an external investigation confirming "frequent pressure" to admit students "connected to influential people,"[4] and where the Board adopted measures to deny Regent Hall access to a disk containing the unredacted records compiled in the investigation;

- Texas Attorney General's Office—where the state's chief legal officer concluded that Regent Hall, as a System fiduciary charged with overseeing UT governance, has an inherent right of access to the records underlying the Kroll Report,[5] thus spurring the Board, two days later, to stiffen its information-access rules for Regents; and

- Texas Supreme Court—where the years-long saga ends, the Court having concluded that Regent Hall's *ultra vires* suit against the chancellor (the first by a regent against the University or the chancellor since UT opened in 1873 with eight professors and 221 students) cannot overcome the State's sovereign immunity.

UT sculptor Wood Hall is probably unrelated to UT Regent Wallace Hall. But both risked much in service to the twelve words of aspiration—both scholarly and heavenly—etched onto UT's most iconic building.

I join the Court's opinion. The doctrine of sovereign immunity, by insulating im-

prudence, is innately unfair to those wronged. The deal it strikes is often a raw deal.

\* \* \*

Everything is bigger in Texas, including political theater, and the odyssey of Wallace Hall is, like most Texas tales, filled with outsized personalities. Regent Hall has never been bashful about asking unwelcome questions. He is inquisitive. His detractors brand his inquiries an inquisition. He is probing. His decriers consider his probes a problem. He is questioning. His disparagers deem his questions a quandary. Regent Hall takes his oversight role seriously, spurred by a no-nonsense fiduciary duty to the University, including the specific statutory responsibility to "set campus admission standards."[6] But his questions about wrongdoing (and not just about admissions) have sown discord. The Board considers Regent Hall's request for the Kroll disk less oversight than overreach.

The Board of Regents did much to keep critical documents away from Regent Hall, instituting, as the Court describes it, "a governance structure that leaves Hall at the mercy of the Chancellor's discretionary legal determination."[7] But even before the Board's July ratification of the chancellor's proposed two-step process, the Hall hubbub had already incited rules changes. In May 2015, just two days after the Attorney General issued his pro-Hall opinion—concluding the Board "may not prohibit an individual regent from obtaining access to records in the possession of the University that are necessary to fulfill his duties as a

---

4. Kroll Associates, *Final Report to the Office of the Chancellor of the University of Texas System*, at 39 (February 6, 2015).

5. Tex. Att'y Gen. Op. No. KP-0021 (2015). The Attorney General has filed a brief supporting Regent Hall in this case.

6. TEX. EDUC. CODE § 51.352(d)(4).

7. *Ante* at 243.

regent" [8]—the Board made telling deletions to Regents' Rule 10101 § 3.1:

> In carrying out the duties and responsibilities referenced ... above, it is the responsibility of each Regent to be knowledgeable ... and each member of the Board of Regents has the right and authority to inform himself/herself as to the duties, responsibilities, and obligations of the member in such a manner as they each may deem proper. Members of the Board of Regents are to be provided access to such information as in their individual judgments will enable them to fulfill their duties and responsibilities as Regents of the U.T. System.

Besides dialing back § 3.1's prior emphasis on Regents' individualized discretion and judgment, the Board that same day also (1) amended § 5.4.5 to require a Board majority (up from two votes) to approve a Regent's unresolved information request, and (2) adopted § 5.4.6 to delegate to the chancellor the duty of applying federal privacy law. The Attorney General's pro-access opinion predated—indeed, likely *provoked*—these Hall-proofing restrictions, and the Attorney General's brief in this Court argues that Regent Hall, as a member of the UT's governing board charged with setting admissions policies, satisfies the federal "legitimate educational interest" standard that entitles him to access the complete, unredacted Kroll file.[9]

But Regent Hall did not sue his fellow Regents for limiting his right to access. He sued the chancellor, who carried out the Board's directive to strip out confidential material. The chancellor's record redactions were carried out at their behest. As the Court explains, his withholding of unredacted records did not exceed his granted authority; it was fully within it—*intra*, not *ultra*, his *vires*—per the Regents' express, parameter-setting command: Regents' Rule 10801 § 5.4.6. Regents' rules carry the same legal force as an enactment of the Legislature and prescribe the chancellor's specific responsibilities.[10] It may seem a distinction without a difference, to name the CEO instead of the Regents to whom the CEO reports. But amid the Byzantine complexity of sovereign-immunity law, which admittedly elevates form over substance, missing a procedural bull's-eye is sometimes fatal.[11] As the Court notes, the limits on Regent Hall's claimed right to complete access "are limits imposed by the Board ... attributable to the Board and no one else."[12] We take suits as we find them, and this one, ably argued by both sides, named the chancellor who *enforced* the Regents' access restrictions rather than the Regents who *enacted* them.

The Court recognizes the disquieting concerns raised by the Board's access restrictions: "We are not unsympathetic to Hall's plight."[13] Under Texas law, individual Regents owe an individual duty to

---

8. Tex. Att'y Gen. Op. No. KP-0021 (2015).

9. 20 U.S.C. § 1232g(b)(1)(A).

10. *Univ. of Hous. v. Barth*, 403 S.W.3d 851, 855 (Tex. 2013).

11. For example, under the Texas Tort Claims Act's election-of-remedies provision, "if suit is filed against a government employee in that employee's official capacity, then '[o]n the employee's motion, the suit against the em-

ployee shall be dismissed unless the plaintiff files amended pleadings dismissing the employee and naming the governmental unit as defendant' within thirty days." *Tex. Adjutant Gen.'s Office v. Ngakoue*, 408 S.W.3d 350, 352 (Tex. 2013) (quoting TEX. CIV. PRAC. & REM. CODE § 101.106(f)).

12. *Ante* at 240.

13. *Ante* at 243.

exercise individual judgment.[14] That necessarily requires individual access. The Legislature does not see a Regency as a sinecure, but as a solemn fiduciary committed to institutional accountability, including blowing a whistle on potential improprieties. The Board's new access hurdles have the potential to short-circuit unwanted inquiries by Regents who, like Wallace Hall, wield an abundance of verve and resolve. The Court concedes as much, noting the access scheme perhaps "elevates the status quo above transparency,"[15] something Machiavelli warned of 500 years ago: "the reformer has enemies in all those who profit by the old order, and only lukewarm defenders in all those who would profit from the new order."[16]

\* \* \*

*"Ye shall know the truth, and the truth shall make you free."* [17]

I am not a Longhorn alumnus. But I revere what is doubtless the most-read inscription on the Forty Acres, an inscription I hope, notwithstanding today's result, will hearten future truth-seekers and truth-tellers ... til Gabriel blows his horn.[18]

Justice Guzman , concurring.

Contrary to a well-known aphorism, silence is not always golden.[1] Silence has a cost. Silence allows for injustice, stunts growth, and thwarts change. The case before us today submits further proof that enlightenment comes from questions, even more than answers.[2]

Following Regent Wallace L. Hall Jr.'s inquiries about the University of Texas's admission practices, then-Chancellor Francisco Cigarroa initiated an internal investigation that uncovered concerns about external influences on admission decisions at UT. Further inquiry and disclosures prompted the University to commission an independent external audit of admission practices. In pursuing the matter further, UT's governing body, the UT System

---

**14.** *"Each member* of a governing board has the legal responsibilities of a fiduciary in the management of funds under the control of institutions subject to the board's control and management." TEX. EDUC. CODE § 51.352(e) (emphasis added). The Regents' own rules still underscore individualized responsibility. For example, Regents' Rule 10101 § 3.1, swiftly diluted after the Attorney General's May 2015 opinion, still stresses "it is the responsibility of *each Regent* to be knowledgeable" adding, *"each member* of the Board of Regents has the right and authority to inform himself/herself as to the duties, responsibilities, and obligations of the member." (emphases added).

**15.** *Ante* at 243.

**16.** NICCOLO MACHIAVELLI, THE PRINCE AND THE DISCOURSES 21 (Luigi Ricci trans., McGraw Hill Educ. 1st ed. 1950) (1532).

**17.** *John* 8:32 (King James).

**18.** LEWIS JOHNSON & JOHN LANG SINCLAIR, "THE EYES OF TEXAS" (1902).

**1.** *See Ecclesiastes* 3:17 (King James) ("To everything there is a season ... a time to keep silence, and a time to speak.").

**2.** *See Matthew* 7:7 (King James) ("Ask, and it shall be given you; seek, and ye shall find; knock, and it shall be opened unto you."); WISDOM FOR THE SOUL: FIVE MILLENNIA OF PRESCRIPTIONS FOR SPIRITUAL HEALING 583 (Larry Chang ed., 2006) ("It is not the answer that enlightens, but the question." (quoting EUGÈNE IONESCO, DECOUVERTES (1969))); CLAUDE LEVI-STRAUSS, LE CRU ET LE CUIT [The Raw and the Cooked] 15 (1964), https://monoskop.org/images/3/3a/Levi-Strauss_Claude_Mythologies_1_Le_cru_et_le_cuit.pdf ("Le savant n'est pas l'homme qui fournit de vraies réponses; c'est celui qui pose les vraies questions.") ("The wise man doesn't give the right answers, he poses the right questions." (Eng. trans.)).

Board of Regents,[3] expressed the conviction that "the integrity of the admissions process at a public university depends upon the unbiased determination of the appropriate merits of each applicant; that attempts to unduly influence the process are inappropriate; and that a student should not be advantaged or given special consideration as a result of ... connections or financial resources."[4]

After an extensive six-month investigation involving several hundred thousand pages of documents, the independent auditor, Kroll Associates, reported its findings to the University shortly after Admiral William H. McRaven's succession as Chancellor of the UT System. According to the publicly released Kroll Report, a pattern and practice of considering applicants outside the regular admission process existed at UT, causing "increasing levels of tension" between the Admissions Office and the University President's office, but resulting in only a "handful" of applicants being admitted over the Admissions Office's objection each year.[5] Though an increasing number of applicants had been considered for admission in this manner, Kroll found that a relatively small number of "arguably less-qualified applicants" actually benefitted from the practice.[6]

While no evidence existed that spots had been "save[d]" for certain applicants or that any applicant had been admitted based on a *quid pro quo* or other inappropriate promise or exchange, Kroll determined it was "readily apparent that certain applicants are admitted at the instigation of the President over the assessment of the Admissions Office," for a variety of reasons.[7] This aspect of UT's admission processes had not been publicly disclosed, however.[8] Nor had undisclosed admission practices been divulged during the internal investigation, which Kroll characterized as constituting "material omissions [that] misled the [internal] inquiry." In that regard, the report concluded that key UT officials failed "to speak with the candor and forthrightness expected of people in their respective positions of trust and leadership." [9]

The Kroll Report concludes that, while disconcerting, the admission practices did not violate any existing law, rule, or policy. Nevertheless, issues of fairness and transparency were implicated and guidance for University officials was merited.[10] Considering a variety of sources for best practices, Kroll outlined recommended policies and procedures for avoiding undue influence in university admissions, if the Chancellor and Board of Regents determined that such reforms were necessary.[11]

In response to the Kroll Report, Chancellor McRaven convened a Blue Ribbon

---

3. *See* TEX. EDUC. CODE §§ 51.352, 65.11, 65.31, 67.02.

4. KROLL ASSOCIATES, FINAL REPORT TO THE OFFICE OF THE CHANCELLOR OF THE UNIVERSITY OF TEXAS SYSTEM, at 11 (February 6, 2015) (Kroll Report); *see also* Kroll Report, App. A, Ex. A (outlining the "scope of work").

5. *Id.* at 13.

6. "The total number of arguably less-qualified applicants who have benefitted from the hold system and the [UT] President's oversight of the hold candidates appears to be relatively small. Indeed, from 2009 to 2014 Kroll identified a total of only 73 enrolled applicants who were admitted with both a combined SAT score of less than 1100 and a high school GPA of less than 2.9." *Id.*

7. *Id.* at 13–14.

8. *Id.* at 14.

9. *Id.*

10. *Id.* at 14, 36.

11. *Id.* at 93.

panel of former chancellors and University presidents to review UT's admission processes in light of the Kroll Report's findings and recommendations. The panel made recommendations for strengthening the admission process at UT. Thus, prompted by Regent Hall's inquiries, deficiencies that threatened to undermine the integrity of the admission process were exposed and addressed.

The upshot is that inquiries can and do spur positive change when those with the power to act are willing to engage in critical self-examination, as UT's Chancellor and Board of Regents did in this case. But does that mean there are no more inquiries to be made? Not in Regent Hall's view. And not from the perspective of the two other regents who supported his motion to review the documents provided to Kroll Associates.[12] All have expressed concern that regents must have the information they need to fulfill their duties and responsibilities to the UT System, including "the legal responsibilities of a fiduciary in the management of funds under the control of institutions subject to the board's control and management."[13] All have questioned whether regents—guardians of the University's welfare and reputation—can make informed decisions if they do not have access to the underlying data and documents on which recommended policies and procedures are based. Context is often vitally important, and as the Court observes here, "facts are the greatest ally" in the quest for change.[14] I fully agree.

Yet, the record before the Court reflects that Regent Hall has not been denied access to the documents Kroll Associates reviewed. Rather, he was offered—and has accepted—access to the Kroll documents with certain student information redacted, information that is, at least in some respects, confidential under the Family Educational Rights and Privacy Act (FERPA).[15] He has also been offered—but declined—a process by which to obtain all the information he seeks, a process that ostensibly balances privacy interests against an assurance of legitimate need. The process reflects the governing body's judgment that an individual regent's interest in a particular matter can overcome competing privacy rights of students, but not necessarily or automatically.

The Board-adopted two-step process may have afforded Regent Hall access to all the information necessary to fulfill his obligations as a regent without the necessity of judicial intervention. But must a University official imbued with broad oversight authority for the UT System—one who is charged with setting admission standards and subject to criminal sanctions if confidential information is misused—prove his mettle before obtaining the same degree of access the Board has allowed to third parties, like Kroll Associates, and myriad UT personnel engaged in the redaction process?[16] Should a regent's right

---

**12.** Regents Alex M. Cranberg and Brenda Pejovich along with two former board members filed an amicus brief supporting Hall's request for unrestricted access to the materials provided to Kroll Associates. These current and former regents "emphasize that a regent should not have completely unfettered access to data and documents containing personally identifiable student information," but explain that the starting point of the analysis must be a presumption of openness rather than a presumption of confidentiality.

**13.** Tex. Educ. Code § 51.352.

**14.** *Ante* at 243.

**15.** 20 U.S.C. § 1232g.

**16.** *See* Tex. Att'y Gen. Op. No. KP–0021 (2015) (opining that the Board of Regents

of access to confidential information be presumed or need it be established when compelling privacy interests are at stake? [17]

Redressing grievances when rights and duties collide is the bread and butter of the judicial system, but our ability to decide the merits of this dispute is constrained by the limits of our jurisdiction. And this is no trifling matter.[18] So, while the separate writings issued today may touch on the merits, the Court cannot, because disposition of this appeal ultimately turns on whether Hall asserts a valid *ultra vires* action against Chancellor McRaven. As the court of appeals held, and as this Court unanimously affirms, the answer to that threshold matter precludes further inquiry into the merits of the parties' arguments.

The Court faithfully applies *ultra vires* principles and our precedent in holding that Chancellor McRaven, a dedicated public servant committed to honoring the chain of command, was obliged to follow the Board of Regents' directives and therefore did not act *ultra vires*.[19] I therefore fully join the Court's opinion and judgment. I write separately primarily to

underscore that the issues raised and the applicable legal standards restrict the Court's ability to reach the merits of the underlying dispute.

The circumstances of this case also compel me to highlight the importance of judicious inquiry, especially considering that the caretakers of the University of Texas—an educational institute "of the first class"[20]—are charged with cultivating scholars and future leaders. Although members of a group must work within rules that provide essential order, the events precipitating the underlying dispute confirm the benefits of being open to inquiry and examination. History, replete with examples of great debacles that might have been avoided had someone spoken up, validates the principle that "[i]t is error only, and not truth, that shrinks from inquiry."[21]

Justice Lehrmann, concurring.

*"[T]he secret of Education lies in respecting the pupil."*[1]

I agree with the Court that Regent Hall has failed to plead a valid *ultra vires* claim, and I join both the Court's judgment and

---

"may not prohibit an individual regent from obtaining access to records in the possession of the University that are necessary to fulfill his duties as a regent"); *see also ante* at 245 (WILLETT, J., concurring) (citing the Attorney General's decision with approval).

17. "Who will guard the guardians?" JUVENAL, SATIRE VI 6.346-48, http://www.thelatinlibrary. com/juvenal/6.shtml ("sed quis custodiet ipsos custodes").

18. *See, e.g., Houston Belt & Terminal Ry. Co. v. City of Houston*, 487 S.W.3d 154, 160 (Tex. 2016) (observing sovereign and governmental immunity implicate subject-matter jurisdiction) (citing *Rusk State Hosp. v. Black*, 392 S.W.3d 88, 91 (Tex. 2012)); *Greene v. Farmers Ins. Exch.*, 446 S.W.3d 761, 767 (Tex. 2014) (citing constitutional advisory-opinion restrictions in deciding not to consider an issue

when the Court's disposition of another issue resolved the parties' dispute); *Valley Baptist Med. Ctr. v. Gonzalez*, 33 S.W.3d 821, 822 (Tex. 2000) ("Under article II, section 1 of the Texas Constitution, courts have no jurisdiction to issue advisory opinions.").

19. *Ante* at 242.

20. TEX. CONST., art. VII, § 10.

21. THOMAS PAINE, *Letter Addressed to the Addressers on the Late Proclamation, in* LIFE AND WRITINGS OF THOMAS PAINE 186, 209 (Daniel Edwin Wheeler ed., 1908), https://archive.org/stream/lifewritingsofth05pain#page/n0/mode/2up.

1. Ralph Waldo Emerson, LECTURES AND BIOGRAPHICAL SKETCHES 141 (1884).

its thoughtful opinion. I also am mindful that the inscription on The University of Texas campus highlighted in one of today's separate writings, "ye shall know the truth and the truth shall make you free,"[2] is much more than an inspirational musing chiseled in stone. These sacred words originating in holy scripture, so appropriately utilized by institutions of higher learning to promote academic freedom and the power of learning, undoubtedly have broad import in a democratic society. Transparency begets accountability.

Also critically important, both as a general matter and in the context of this case, are individuals' rights to choose when and under what circumstances to share private information about themselves with others. Consistent with this principle, federal law protects the confidentiality of information students disclose to educational institutions. *See generally* Family Educational Rights and Privacy Act (FERPA), 20 U.S.C. § 1232g.

I write separately to stress the importance of both of these foundational tenets, and to acknowledge that The University of Texas System has the responsibility to abide by both. For ultimately, "[c]onfidentiality and transparency are not mutually exclusive, but rather two sides of the same coin."[3]

\* \* \* \*

Universities play a significant role in shaping our society. These institutions of higher learning are beacons of light, not only serving to educate our populace and to test novel theories that have the potential to improve society in a myriad of ways, but also shining as examples of excellence for generations to come. With this position comes the responsibility to uphold the highest standards of integrity.

So when the Kroll Report was published, revealing that a small number of applicants to UT–Austin's undergraduate program who had been monitored by the President's office were admitted even though their qualifications were below the norm in terms of admission criteria, members of both the university community and the public at large were justifiably concerned about the potential for improper influences on the admissions process. Although the percentage of applicants whose qualifications raised questions was quite low[4] and the Kroll Report concluded the admissions practices appeared to have violated no existing law, rule, or policy, this flagship university is held to the utmost professional standards. Therefore, as a result of the report, UT–System Chancellor William McRaven convened a blue-ribbon panel to review the admissions process, and the Board of Regents subsequently adopted a new admissions policy.

Moreover, when Regent Wallace Hall requested access to the documents underlying the report, the Board granted the request subject to FERPA's mandatory

---

2. *John* 8:32 (King James).

3. Holger Stark & Marcel Rosenbach, *Interview with German Interior Minister Thomas de Maizière*, SPIEGEL ONLINE (Dec. 20, 2010), http://www.spiegel.de/international/germany/spiegel-interview-with-german-interior minister-wikileaks-is-annoying-but-not-a threat-a-735587.html.

4. From 2009 to 2014, UT–Austin admitted a total of 91,247 freshmen students (44,293 of whom enrolled at the University) out of 207,-

350 applicants. *Common Data Set*, UNIV. OF TEX. AT AUSTIN, https://sps.austin.utexas.edu/sites/ut/IRRIS/Pages/CDS.aspx. The Kroll Report found that, during this time frame, 73 students being monitored by the President's office were admitted despite having grades and test scores substantially below the median for admitted students. This amounts to approximately .036 of 1% of those who applied, .08 of 1% of those admitted, and .16 of 1% of those who enrolled.

privacy restrictions, turning over tens of thousands of pages of partially redacted material. In doing so, the Board fulfilled both its obligation to disclose the requested information and its duty to comply with federal privacy laws, which required a decision to be made about what was and what was not protected information. Educational institutions are charged with the responsibility to exercise discretion in ensuring their compliance with FERPA. *See* 34 C.F.R. § 99.32(a) (requiring educational institutions to maintain, for "each request or disclosure" of a student's education records, a record that includes the "parties who have requested or received personally identifiable information from the education records" and the "legitimate interests the parties had in requesting or obtaining the information"). This necessarily includes the process of determining when personally identifiable student information may be properly disclosed without the student's or parent's consent. This task was assigned to Chancellor McRaven.

The discretion committed to educational institutions in complying with FERPA is exemplified by the parameters of the exception on which Regent Hall relies to request access. To that end, FERPA does not allow disclosure of protected student information to institutional officials based solely on hierarchy or position. Instead, FERPA allows an institution to disclose protected information only to those "school officials ... who have been determined by such ... institution to have legitimate educational interests." 20 U.S.C. § 1232g(b)(1)(A). Nor does FERPA permit disclosure to one entity to justify disclosure to another. With each revelation, the student's privacy rights must be considered anew, and an independent determination must be made that disclosure is justified on its own terms. *See* 34 C.F.R. § 99.32(a). Further, the administrative regulations implementing FERPA do not

elaborate on what constitutes "legitimate educational interests." *See id.* § 99.31(a)(1)(i)(A). The Secretary of Education has expressly declined to provide more definitive guidance, explaining that "[e]ach educational agency and institution must establish its own criteria, according to its own procedures and requirements, for determining when its school officials have a legitimate educational interest in a student's records." Family Educational Rights and Privacy, 53 Fed. Reg. 11,942, 11,955 (Apr. 11, 1988) (discussion by Office of the Secretary of Education). FERPA thus demands that these determinations be fact specific so that protection of this information is maximized.

The privacy interests underlying FERPA cannot be overstated. Students trust universities with a plethora of personal information. Some of that information, such as social security numbers, is specifically required as part of the application process. But students may also choose to volunteer sensitive and potentially embarrassing information about themselves, perhaps in a personal essay, that they are not otherwise required to reveal. These students should feel comfortable in the knowledge that this information is seen only by those with a legitimate reason under FERPA.

No one disputes that Regent Hall has a legitimate educational interest in the Kroll documents generally. But, he assumes that this interest necessarily encompasses *all* the sensitive, personally identifiable information in those documents that unquestionably is protected by FERPA. As Chancellor McRaven argues, Regent Hall never attempted to articulate a legitimate interest in any specific information. While I agree with the Court that we need not reach the issue of whether Chancellor McRaven properly applied FERPA, I cannot fault his refusal to accept Regent

Hall's *carte blanche* approach in light of the privacy interests at stake.[5] Compliance with FERPA, particularly its restrictions on disclosure of protected information to school officials, is a matter of internal governance and is committed to the institution's discretion. Today the Court appropriately determines that, as it stands, the law does not allow courts to interfere with the exercise of that discretion.

The University of Texas cannot pick and choose when to comply with its legal obligations. In this case, the System's chancellor complied with his responsibilities and the Board of Regents' directive by producing the information requested by Regent Hall in a manner that would safeguard FERPA-protected data. Chancellor McRaven thus acted well within his authority and, in doing so, assured students that the trust they place in the System to protect the privacy of their records is well founded.

JUSTICE BROWN, joined by
JUSTICE GREEN, concurring.

I join the Court's opinion in full and without reservation. The Court correctly decides that sovereign immunity bars Regent Wallace Hall's claims against Chancellor William McRaven. And the Court so decides, not with passion or prejudice, but with a healthy reverence for the constitutional separation of powers that compels our decision. Sovereign immunity is "an established principle of jurisprudence in all civilized nations." *Beers v. Arkansas*, 61 U.S. (20 How.) 527, 529, 15 L.Ed. 991 (1857). Indeed, it is "inherent in the nature of sovereignty." THE FEDERALIST No. 81 (Alexander Hamilton). And in our system of government, the people are the sovereign: "All political power is inherent in the people, and all free governments are founded on their authority, and instituted for their benefit." TEX. CONST., art. I, § 2. As Alexander Hamilton once said, "Here, sir, the people govern."

In Texas, "the people's will is expressed in the Constitution and laws of the State," and so "to waive immunity, consent to suit must ordinarily be found in a constitutional provision or legislative enactment." *Wichita Falls State Hosp. v. Taylor*, 106 S.W.3d 692, 695 (Tex. 2003). We do not begrudge this balance of power. Rather, we respect it. Our role is to simply and carefully consider when the people have preserved their immunity and when they have waived it. It is not to publicly grouse when we are disappointed in the result we reach.

The Court holds today that Hall has not overcome sovereign immunity. Because that holding deprives this Court of jurisdiction to further consider the merits of Hall's claims, we do not weigh the parties' arguments on the merits. *See Rusk State Hosp. v. Black*, 392 S.W.3d 88, 95 (Tex. 2012) ("We have said on numerous occasions that sovereign immunity deprives courts of subject-matter jurisdiction."). It is therefore incumbent upon us to show restraint in commenting on the underlying merits of Hall's claims.

That means it matters not whether our decision protects privacy or advances transparency. And we should never worry ourselves with which party's motives are purer or more virtuous. The question we face here is whether sovereign immunity

---

**5.** Regents have the statutory responsibility to "set campus admission standards," TEX. EDUC. CODE § 51.352(d)(4), but they have no role in individual admission decisions. In light of the privacy rights of the individual students involved, in my view, Regent Hall would not have been able to articulate a "legitimate educational interest" in complete access to all unredacted documents. However, he might have been able to express such an interest in some of those documents.

bars the petitioner's claims. It does. Case over.